UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

SIEMENS BUILDING
TECHNOLOGIES, INC.,

           Plaintiff,

        v.                                    Case No. 04-C-1256

COMMERCIAL ELECTRICAL
SOLUTIONS OF WISCONSIN, LLC,
d/b/a Commercial Electric/Connectivity
Solutions, Inc.,

           Defendant.

DECISION AND ORDER FOR JUDGMENT IN FAVOR OF THE PLAINTIFF

After a trial before the court and based on the stipulations set forth in the Joint

Pretrial Report of March 16, 2006, as well as testimony and exhibits, the court makes the

following findings of fact and conclusions of law.

FINDINGS OF FACT

1.     Plaintiff, Siemens Building Technologies, Inc. (Siemens) is a Delaware

corporation with its principal place of business at 1000 Deerfield Parkway, Buffalo Grove,

Illinois.  Siemens is in the business of manufacturing, installing and servicing building control

systems, fire alarms and life safety systems.

2.     Defendant Commercial Electrical Solutions of Wisconsin, L.L.C. d/b/a

Commercial Electric/Connectivity Solutions, Inc. (CES) was a Minnesota limited liability

company in the business of installing electrical systems.

3.     On September 4, 2002, the School District of South Milwaukee (School District) entered a contract with J.P. Cullen & Sons, Inc. (Cullen) to renovate the South Milwaukee High School and Middle School in South Milwaukee, Wisconsin (the Project).

4.     Cullen was the general contractor on the  Project.

5.     DLR Group was the architect on the project and Kelly Artz was the DLR Group engineer with primary responsibility for electrical design and project specifications.

6.     On or about January 3, 2003, DLR Group issued Volume three of the Project Manual.

7.     Volume three of the Project Manual for the project contained the bid specifications for the Division 16 contractor, as set forth in Sections 16050 through 16780 of the Project Manual (Ex. 12), and the Division 17 contractor, as set forth in Sections 17000 through 17941 of the Project Manual (Ex. 8).

8.     Section 17724 of the Project Manual sets forth the specifications for the Intrusion Detection and Access Control System; Section 17832  sets forth the specifications for the Closed Circuit Television System; Section 17851 sets forth the specifications for the Fire Alarm System; and Section 17900 sets forth the specifications for the HVAC Instrumentation and Controls.  (Ex. 8)

9.     Part 1.2E of Section 17851 (Fire Alarm) states :

> Conduit rough-in for devices shown on the plans shall be provided by the division 16 contractor. Boxes specific to system equipment shall be supplied by this contractor.  Raceways in exposed areas, conduit sleeves, D-rings, and other wire management required for system installation shall be the responsibility of this contractor unless specifically shown on the drawings.  Equipment cabinets, racks, etc. shall be provided and installed by this contractor.

The words "this contractor" in Part 1.2E of Section 17851 refer to the Division 17 contractor.

2

(Ex. 8)

10. On January 28, 2003, DLR Group issued Addendum No. 4 to the Project Manuals in response to questions regarding terms in the specifications, including Part 1.2E of Section 17851.

11. Item No. 97 to Addendum No. 4 states in pertinent part:

A. To clarify responsibilities for bidding divisions 16 & 17 please see the following:

Division 16 Responsibilities:

Intrusion detection, access control, CCTV, and fire alarm: Provide conduit for device rough-in. Conduit for device rough-in includes a standard box, fittings, and conduit from the device location to the nearest accessible ceiling space. This is not a complete raceway system only device rough-in. Provide 120V connection to control panels as noted on the drawings.

HVAC Instrumentation and Controls: Provide conduit for device rough-in of temperature sensors, CO sensors, and humidistats where shown on the drawings. Conduit for device rough-in includes a standard box, fittings, and conduit from the device location to the nearest accessible ceiling space. This is not a complete raceway system only device rough-in.

* * *

Division 17 Responsibilities:

Intrusion detection, access control, CCTV, and fire alarm: Supply system specific boxes to Division 16 contractor for installation. Provide all end devices, control panels, power supplies, etc. Provide all low voltage cabling. Provide all low voltage terminations. Provide 120V power to control panels/devices and control transformers for equipment not shown on the electrical drawings but required for proper system operation. Provide conduit sleeves through fire rated and/or block walls, floors, etc. Provide D-rings or other suitable cabling management method for organizing cabling runs within corridors. Where cable tray is shown (by others), Div. 17 shall be allowed to utilize tray for cable management.

3

HVAC Instrumentation and Controls: Provide all end devices, control panels, power supplies, etc. Provide all required conduit, boxes, etc. required for system except device rough-in as noted above. Provide both line and low voltage wiring and terminations. Provide permits for all work performed. Provide conduit sleeves through fire rated and/or block walls, floors, etc. Provide D-rings, or other suitable cabling management method for organizing cabling runs within corridors. Where cable tray is shown (by others), Div. 17 shall be allowed to utilize tray for cable management.

12. "Conduit rough-in" as used in Part 1.2E of Section 17851 of the specifications consists of mounting a box and the installation of conduit inside a wall or plaster ceiling to the nearest accessible location to provide a wiring pathway through inaccessible, concealed areas, such as cinder block walls.

13. "Conduit rough-in" under Part 1.2E of Section 17851 does not include the installation of surface-mounted devices and conduit in unoccupied portions of the school buildings (e.g., boiler rooms, mechanical rooms, electrical closets, etc.).

14. Surface-mounted conduit under the project falls within the term "raceways in exposed areas."

15. On March 17, 2003, Cullen entered a Subcontract with Siemens to provide building controls and systems under Section 17724 (Intrusion Detection and Access Control System), Section 17832 (Closed Circuit Television System), Section 17851 (Fire Alarm System) and Section 17900 (HVAC Instrumentation and Controls) of the Project Manual.

16. Siemens was the "Division 17" contractor on the Project.

17. Cullen contracted with Roman Electric to perform the work of the Division 16 contractor on the Project, as set forth in Sections 16050 through 16780 of the Project Manual.

4

18.     On or about April 18, 2003, Siemens entered a Master Subcontract Agreement with CES for installation of the building controls and systems.

19.     Article 4.2 of the Master Subcontract Agreement states:

This Subcontract is subject to each of the drawings, specifications, addenda, terms and conditions contained or incorporated in the Contract between CONTRACTOR and the Customer (the "Contract") which are hereby incorporated by reference excluding only such terms and conditions which by ordinary and reasonable rules of construction are not applicable to the portion of the Project performed by the SUBCONTRACTOR.  Except where it clearly appears from a careful reading of an individual clause that the Customer has a particular and direct interest in this Subcontract, SUBCONTRACTOR agrees to be bound thereby in the same manner as if SUBCONTRACTOR were the named "Contractor" (or such other equivalent term as used therein) in the Contract and CONTRACTOR were the "Customer" (or such equivalent term as used therein) and the word "Subcontractor" therein were the lower-tier subcontractor of SUBCONTRACTOR.

20.     Paragraph 3.3 of Exhibit B to the Master Subcontract Agreement states in pertinent part:

It is expressly understood and agreed by both parties that CONTRACTOR will be paid by the Customer for services and work performed by SUBCONTRACTOR and that SUBCONTRACTOR will not be paid until CONTRACTOR has received payment from the Customer.  Receipt of payment from Customer shall be a condition precedent to the obligation of CONTRACTOR to make payment hereunder.  CONTRACTOR agrees to process the SUBCONTRACTOR'S bills promptly and to take reasonable measures to expedite payments by the Customer.  If any amounts are retained and/or disallowed by the Customer, such amounts will not be paid to SUBCONTRACTOR until CONTRACTOR has received payment of such amounts from the Customer.

21.     The Subcontract Work Order dated June 18, 2003, a copy of which was attached to the Master Subcontract Agreement, described CES's work under the subcontract:

5

"Provide a complete electrical installation of temperature controls, fire alarm and security for the South Milwaukee New High School and Middle School renovation."

      22.     The Subcontract Work Order dated June 18, 2003, further provided that "The subcontract work shall consist of furnishing and installing per plans and specifications the following section: Division 17 Integrated Building System."

      23.     The contract amount stated in the Subcontract Work Order, dated June 18, 2003, was $328,000.00.

      24.     A dispute arose between Siemens and CES regarding which contractor, the Division 16 or the Division 17, was responsible for the installation of the fire alarm conduit in unoccupied portions of the buildings (e.g., mechanical rooms, boiler rooms, electrical closets, etc.) when CES sought additional payment for this conduit installation work.

      25.     The dispute between Siemens and CES arose after CES completed its conduit installation work in the Middle School.

      26.     On April 19, 2004, Douglas Wait of Cullen confirmed in writing to James Cira of Siemens that it was Siemens' obligation as the Division 17 contractor to perform the work at issue and instructed Siemens to proceed with the remaining work at no additional cost to Cullen or the School District. Wait wrote, in pertinent part:

> This letter is in reference to our meeting with Siemens on Friday, April 16, 2004, regarding which contractor is to provide the conduit installation for Division 17 Fire Alarm Work at the above referenced project. Kelly Artz and DLR Group have confirmed that it is in fact Siemens [sic] work to execute.
>
> Specifically, Section 17851, Paragraph 1.2E, states "Raceways in exposed areas shall be the responsibility of this contractor " Addendum #4, Item 97 further clarifies responsibilities of Division 16 and Division 17, in regards [sic] to this issue and does not negate this statement.

Please proceed with the remaining work at no additional cost to J.P. Cullen & Sons, Inc. or the School District of South Milwaukee.

27.     Wait's April 19, 2004, letter states that the conduit installation work for which CES seeks additional compensation constituted "raceways in exposed areas" not "conduit rough-in."

28.     Following Doug Wait's letter of April 19, 2004, Siemens instructed CES to proceed with the installation of the remaining fire alarm conduit at no additional cost to Siemens.

29.     After completing its work on the project, CES made a claim to Siemens for $119,099.40 in additional compensation for fire alarm conduit work.

30.     On or about November 4, 2004, Mike Hobbs, Siemens' Business Development Manager on the Project, conducted a room-by-room walkthrough of the school buildings to verify the fire alarm conduit work CES had performed. Hobbs measured the surface-mounted conduit and counted material, such as connectors, couplings, hole straps, boxes, covers, anchors, hanger assemblies and straps, that CES claimed to have installed.

31.     CES did not perform similar survey of the work for which it seeks compensation by Siemens.

32.     Applying the material costs and hourly labor rate set forth in CES' claim to his room-by-room measurements and counts, Hobbs determined that CES overstated its costs of installing the fire alarm conduit by more than 125%.

33.     The 2006 "R.S. Means Electrical Cost Data" published by Reed Construction Data, Inc., states that the average installing contractor charges $3.61 per linear foot of  inch diameter Electric Metallic Tubing (EMT). The rate of $3.61 includes material,

7

labor, overhead and profit. Also included are installation of conduit to a height of fifteen (15) feet, two terminations, two elbows, 11 beam clamps and couplings for each 100 linear feet.

34. R.S. Means Electrical Cost Data is a guide for the market value of the work CES claimed it performed.

35. Applying the Means Electrical Cost Data's rate of $3.61 per linear foot of conduit to CES' estimate that it installed 9500 feet of fire alarm conduit outside the scope of its contract with Siemens, the market value of such work is $34,295.00.

36. CES is the employer of union personnel and had a non-delegable responsibility to pay benefits to the Electrical Construction Industry Board (the ECIB) according to its standing union contract. Failure to pay these sums constituted a breach of the Master Subcontract Agreement between Siemens and CES.

37. As of October 12, 2004, CES had failed to pay nearly $70,000 to the ECIB for work performed by CES' union employees on the Project.

38. The ECIB threatened to proceed against Cullen's bond for the amounts CES owed to the ECIB.

39. Cullen withheld $211,367.72 of Siemens' payment pending resolution of the ECIB's claim and CES' claim for additional compensation.

40. Siemens brought this action on December 30, 2004, to compel CES to satisfy its obligations to the ECIB and to prevent the ECIB from making a claim against Cullen's bond. Additionally, Siemens sought a declaration by the court that it is not liable to pay CES any additional compensation for conduit work on this project.

41. Siemens incurred and paid legal fees totaling $8,853.62 as a consequence of the contributions claim asserted by the ECIB.

42.     CES' breach of the Master Subcontract Agreement in failing to pay the ECIB the aforementioned legal fees was the proximate cause for Siemens' $8,853 legal expense regarding the ECIB contribution claim.

42.     CES satisfied its obligations to the ECIB in February 2005, and Siemens voluntarily dismissed Count I of the Complaint in this action relating to the union's claim.

43.     Cullen released its final payment to Siemens in February 2006, but only after Siemens agreed to indemnify Cullen against any claims brought by CES relating to this lawsuit.

44.     CES filed a counterclaim in this action seeking $119,099.40 in additional compensation for the fire alarm conduit work.  Also, CES seeks to recover from Siemens the remaining balance ($33,937.00) under the subcontract.

45.     Siemens claims entitlement to various offsets against any amounts it owes to CES for deficient work performed by CES and its attorneys' fees relating to the ECIB claim plus interest.

46.     Siemens incurred $19,743.00 in back charges assessed by Cullen for clean up ($7,742.00), ceiling tile repair ($4,625.00), door frame repair ($2,795.00), and paint touch-up ($4,581.00).

47.     At a rate of 5 percent (5%), the $211,367.72 that Cullen withheld from payment to Siemens from September 13, 2004, through February 21, 2006, solely as a result of CES' claim for additional compensation and the ECIB's contributions claim would have earned $15,230.06.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this diversity case pursuant to 28 U.S.C. 1332(a).

2. The Subcontract between Siemens and Cullen is a valid, binding and enforceable contract.

3. The Master Subcontract Agreement between Siemens and CES is a valid, binding and enforceable contract.

4. Count II of the Complaint filed by Siemens states a claim for declaratory relief under the federal Declaratory Judgment Act. That provision permits the court to declare the rights and liabilities of the parties:

> In a case of actual controversy within its jurisdiction any Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. 2201.

5. The surface-mounted conduit work at issue constituted "raceways in exposed areas" not "conduit rough-in" and the responsibility of CES under Part 1.2E of Section 17851 of the fire alarm specifications.

6. Siemens is not obligated to pay CES any amount above the contract amount required by the Master Subcontract Agreement.

7. For CES to prevail on its counterclaim for breach of contract, it must establish an offer, acceptance, breach of contract by Siemens and that as a party to that contract, it performed its obligations fully.

8. CES has not established the facts necessary to prove its entitlement to $119,099.40 additional compensation for conduit work inasmuch as the surface-mounted

conduit work upon which the counterclaim rests"raceways in exposed areas" not "conduit rough-in" – and was thus CES' responsibility under Part 1.2E of Section 17851 of the fire alarm specifications.

9.     CES has not established that Siemens breached the terms of the Master Subcontract Agreement.

10.     Under Section 138.04 the Wisconsin Code, a prevailing party is entitled to prejudgment interest at a rate of 5 percent (5%) per annum.

11.     Siemens is entitled to 5 percent interest on the $211,367.72 that Cullen withheld from September 13, 2004, to February 21, 2006, on its contract payments to Siemens, as a result of CES' breach of contract resulting from its failure to timely fulfill its non-delegable obligation to pay benefits to the ECIB.

12.     Siemens is entitled to the following set-offs against the remaining contract balance under the Master Subcontract Agreement:

>    a)     $8,853.62 in attorneys' fees to resolve the claim of the
>    ECIB against CES and to prevent the fund from making a claim
>    against Cullen's bond; and
>
>    c)     $15,230.06 in interest on $211,367.72 that Cullen withheld
>    from payment to Siemens from September 13, 2004 through
>    February 21, 2006 solely as a result of CES' claim for additional
>    compensation and the union benefits fund's contributions claim.

13.     Siemen did not present timely claims against CES for offsets deducted by Cullen from Cullen's contract with Siemens.

14.     Siemens' set-offs ($24,083.68) do not exceed the contract balance remaining under the Master Subcontract Agreement ($33,937.00). Consequently, the court finds that Siemens is obligated to pay CES $9853.32 withheld under the Master Subcontract Agreement.

15.     Siemens failed to establish that any damages at the project site are attributable to CES Siemens.

16.     CES' breach of the Master Subcontract Agreement in failing to pay the ECIB the aforementioned legal fees was the proximate cause for Siemens' $8,853 legal expense regarding the ECIB contribution claim.

For all the foregoing reasons,

IT IS ORDERED that Siemens is not liable to CES in any sum on any claim for excess work on the project and that Siemens is entitled to judgment against CES on Count II of its Complaint.

IT IS FURTHER ORDERED that the counterclaim of CES be dismissed for failure of proof.

IT IS FURTHER ORDERED, pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, that Siemens is entitled to its costs under 28 U.S.C. § 1920 as the prevailing party.

Dated at Milwaukee, Wisconsin, this 25th day of April, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE